## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YURI ALISHAEV, ABRAHAM JEREMIAS, and MORRIS JEREMIAS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MERRILL LYNCH COMMODITIES, INC., BANK OF AMERICA CORPORATION, MORGAN STANLEY & CO. LLC, EDWARD BASES, JOHN PACILIO, and JOHN DOES 1 – 18,<br><br>Defendants, | Case No. _____<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Yuri Alishaev, Abraham Jeremias, and Morris Jeremias ("Plaintiffs"), upon knowledge as to themselves and their own actions and upon information and belief as to all other matters, including a review of the Department of Justice's ("DOJ") Non-Prosecution Agreement ("NPA") with Defendant Merrill Lynch Commodities, Inc. ("MLCI"),[1] the Commodity Futures Trading Commission's ("CFTC") proceedings,[2] and the indictment against Edward Bases ("Bases") and John Pacilio ("Pacilio") for commodities fraud, spoofing and conspiracy relating to their conduct as precious metals traders,[3] allege the following against Defendants MLCI, Bank of America Corporation ("BAC"), Morgan Stanley & Co. LLC ("MSC"), Bases, Pacilio, and John Does 1 – 18 (collectively, "Defendants").

---

[1] Non-Prosecution Agreement, U.S. Department of Justice (June 25, 2019), the "MLCI NPA."
[2] *In the Matter of: Merrill Lynch Commodities, Inc.*, CFTC Docket No. 19-07, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (CFTC June 25, 2019).
[3] Indictment, *U.S. v. Bases, et al.*, No. 18 CR 48, ECF No. 66 (N.D. Ill. July 17, 2018).

## SUMMARY OF ALLEGATIONS

1.      This action arises from Defendants' intentional manipulation of COMEX gold and silver, and NYMEX platinum and palladium futures contracts, and options on those futures contracts (collectively, "precious metals futures contracts") traded on the New York Mercantile Exchange ("NYMEX") and the Commodities Exchange, Inc. ("COMEX"), during the period of at least January 1, 2008, through December 31, 2014 (the "Class Period"), in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* the ("CEA"), and the common law.

2.      Defendants manipulated the prices of these precious metals futures contracts through "spoofing," placing orders they never intended to execute and then cancelling those orders before execution.  During the Class Period, Defendants' misconduct artificially skewed the prices of precious metals futures contracts to financially benefit their trading positions at the expense of other investors, like Plaintiffs and the Class.

3.      Some of the Defendants have entered into a NPA with the DOJ admitting to what is in essence commodities fraud, spoofing, and conspiracy to commit same.

4.      On June 25, 2019, Defendants MLCI and BAC entered into a non-prosecution agreement with the DOJ, admitting involvement in a "multiyear scheme by MLCI precious metals traders to mislead the market for precious metals futures contracts" traded on COMEX. Defendant BAC also agreed to cooperate with the DOJ, and Defendants MLCI and BAC have agreed to improve their compliance programs and internal controls.  Defendant MLCI will also pay $25 million in criminal fines, restitution and forfeiture of profits.

5.      Defendant MLCI has admitted that it is responsible for the acts of its officers, directors, employees and agents for the misconduct alleged herein, and admitted that such

misconduct constitutes a violation of the law, specifically, commodities fraud, in violation of Title 18, United States Code, Section 1348(1).

6.      On the same day, the CFTC settled with Defendant MLCI, who agreed to cooperate with the CFTC in matters relating to the action, and comply with its corporate compliance program and reporting requirements.[4]  As a result, Defendant MLCI must pay the CFTC an $11.5 million fine.

7.      The CFTC Order states that, through its traders, MLCI engaged in market manipulation of the precious metals futures market in order to manipulate and cause artificial prices in those markets.

8.      Plaintiffs seek damages for themselves and the Class for Defendants' illegal and manipulative misconduct.  Plaintiffs believe that substantial evidentiary support will exist to support the allegations set forth herein after discovery.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 22 of the CEA, 7 U.S.C. § 2.  This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy, and under 28 U.S.C. § 1332, because the amount in controversy for the Class exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

10.     Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. § 1391(b), (c), and (d), and Section 22 of the CEA, 7 U.S.C. § 25(c).  One or more of the

---

[4] "CFTC Orders Merrill Lynch Commodities, Inc. to Pay Approximately $25 Million for Spoofing, Manipulation, and Attempted Manipulation in Precious Metals Futures," Release Number 7946-19, June 25, 2019.

Defendants reside, transact business, are found, or have agents in this District.  Further, a significant part of the events giving rise to the claims occurred in the Southern District of New York.  For example, Defendants Bases and Pacilio placed spoof orders from New York while employed at Defendant MCLI's New York Office.

11.     Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, or the instrumentalities of transportation and communication in interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged herein.

**PARTIES**

**A.     Plaintiffs**

12.     Plaintiff Yuri Alishaev is a citizen of Monsey, New York.  He transacted in COMEX gold and silver, and NYMEX platinum and palladium futures contracts, and options on those futures contracts throughout the Class Period—including on days when the DOJ and CFTC identified that Defendants engaged in spoofing—trading at artificial prices caused by Defendants' unlawful manipulation, as alleged herein.  Defendants spoofed the market for precious metals futures thousands of times throughout the Class Period, which deprived Plaintiffs and the Class of the ability to transact in a lawful, non-manipulated market.

13.     Plaintiff Abraham Jeremias is a citizen of Brooklyn, New York.  He transacted in COMEX gold and silver, and NYMEX platinum and palladium futures contracts, and options on those futures contracts throughout the Class Period—including on days when the DOJ and CFTC identified that Defendants engaged in spoofing—trading at artificial prices caused by Defendants' unlawful manipulation, as alleged herein.  Defendants spoofed the market for

precious metals futures thousands of times throughout the Class Period, which deprived

Plaintiffs and the Class of the ability to transact in a lawful, non-manipulated market.

14.     Plaintiff Morris Jeremias is a citizen of Brooklyn, New York.  He transacted in

COMEX gold and silver, and NYMEX platinum and palladium futures contracts, and options on

those futures contracts throughout the Class Period—including on days when the DOJ and CFTC

identified that Defendants engaged in spoofing—trading at artificial prices caused by

Defendants' unlawful manipulation, as alleged herein.  Defendants spoofed the market for

precious metals futures thousands of times throughout the Class Period, which deprived

Plaintiffs and the Class of the ability to transact in a lawful, non-manipulated market.

**B.     Defendants**

15.     Defendant MLCI is a Delaware corporation with its principal place of business in

Houston, Texas.  MLCI employs hundreds of traders worldwide and has offices in New York.

MLCI is a subsidiary of BAC.  During the Class Period, MLCI employed Defendants Bases and

Pacilio as precious metals traders in this jurisdition.

16.     Defendant BAC is a Delaware Corporation with its principal place of business in

North Carolina.  Defendant BAC is MLCI's parent company and a signatory to the MCLI NPA,

agreeing to fix its compliance and internal controls relating to precious metals futures trading and

its subsidiary MLCI.

17.     Defendant MSC is a limited liability company with its principal place of business

in New York.  Defendant MSC employed Defendant Pacilio during the Class Period.

18.     Defendant Bases is a resident of the State of Connecticut.  Defendant Bases was

employed at Defendant MLCI's New York offices from at least June 2010 until approximately

November 2015.  Defendant Bases has been indicted by the DOJ on one count of conspiracy to

commit wire fraud and commodities fraud and one count of commodities fraud—all related to the conduct at issue in this case.

19.     Defendant Pacilio is a resident of the State of Connecticut.  Defendant Pacilio was employed at Defendant MLCI's New York offices from at least October 2007 until approximately June 2011.  Defendant Pacilio was also employed at Defendant MSC's New York offices from approximately July 2011 until approximately May 2019.  Defendant Pacilio has been indicted by the DOJ on one count of conspiracy to commit wire fraud and commodities fraud, one count of commodities fraud, and five counts of spoofing—all related to the conduct at issue in this case.

20.     Defendants John Does 1–18 are individuals or entities whose identities are as yet unknown to Plaintiffs.  However, these Defendants, both unknown and known to the United States Attorney, are alleged to have engaged in, facilitated, and assisted with the manipulation, and unlawful conduct alleged herein.  These defendants may include other financial firms, or employees or agents of Defendant MLCI, including "Co-Conspirator 1," as identified by the DOJ (or "Trader 1" in the MLCI NPA), and Defendant MLCI's U.K. affiliate that employed Co-Conspirator 1/Trader 1.

## SUBSTANTIVE ALLEGATIONS

A.     **The Market**

21.     A precious metals futures contract creates the obligation to make (a short contract) or take (a long contract) "delivery" of a commodity at some time in the future.  These transactions are governed by Section 5 of the CEA, 7 U.S.C. § 7, which specifies the terms for each of the futures contracts listed, including the underlying commodity, trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuation, and margin

requirements for futures trading of gold, silver, platinum, or palladium, respectively, on which a futures contract is based.

22.     An options contract is an agreement that gives the buyer, or "option holder," the right, but not the obligation, to buy or sell a commodity at a specified price during a specified time period.  The buyer of an option pays an "option premium" to the seller for the right to buy ("call") or sell ("put") the underlying commodity (in this case, precious metals futures contracts).

23.     A "strike price" is the price at which a buyer has the "call option," but not obligation to buy a certain commodity.  The seller is obligated to sell at the "strike price."

24.     A seller has the right, but not obligation, to sell a commodity at a given strike price, thereby obligating the counterparty buyer to buy at the strike price if a "put option" is exercised.  A put option buyer, absent any offsetting hedges, wants the value of the underlying commodity to decrease so that he or she can sell the commodity at a price above market value. However, the seller wants the price of the asset to stay above the strike price so that the seller would not be forced to buy the underlying futures at above-market prices.

25.     The COMEX and NYMEX are commodities exchanges operated by the Chicago Mercantile Exchange Group Inc. ("the CME").  NYMEX and COMEX sell options on futures contracts, which allow market participants to trade on these contracts rather than on the commodities themselves.

26.     The CME Rulebook specifies the conditions for trading on the NYMEX and COMEX.  Participants who violate a Rule may be restricted, suspended or terminated from any platform controlled by the CME Group, or lose their right to supervise the entry of any order in CME Group platforms.[5]

---

[5] NYMEX Rule 402.B(6).

27.    The contract for delivery on COMEX gold futures contracts is one hundred troy ounces of gold.  gold futures contracts trade on the CME Globex platform, and are subject to Chapter 113 of the COMEX rulebook.[6]

28.    A COMEX silver futures contract has an underlying commodity of 5,000 troy ounces.  COMEX silver futures contracts trade on CME Globex as laid out in Chapter 112 of the COMEX rulebook.[7]

29.    The contract for delivery on NYMEX palladium futures is one hundred troy ounces.  Palladium futures trade on the CME Globex platform, pursuant to Chapter 106 of the NYMEX rulebook.[8]

30.    The contract for delivery on NYMEX platinum futures contracts is 50 troy ounces.  Platinum futures trade on CME Globex and are subject to Rule 105 of the NYMEX rulebook.[9]

**B.    Defendants Artificially Manipulated The Price of Precious Metals Futures Contracts to Artificial Levels Throughout The Class Period**

31.    When a precious metal futures trader places a bid offering to buy or sell gold, silver, platinum or palladium futures contracts with the intent to cancel prior to execution, this creates a fraud on market participants known as "spoofing," prohibited by section 747 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), as amended, codified at 7 U.S.C. § 6c(a)(5), and CFE Rule 620 promulgated thereunder.

32.    This spoofing strategy is "intended to, and did, transmit materially false and misleading liquidity and price information and otherwise deceive other market participants about

---

[6] Https://www.cmegroup.com/content/dam/cmegroup/rulebook/COMEX/1a/113.pdf.
[7] Https://www.cmegroup.com/rulebook/COMEX/1a/112.pdf.
[8] Https://www.cmegroup.com/rulebook/NYMEX/1a/106.pdf.
[9] Https://www.cmegroup.com/rulebook/NYMEX/1a/105.pdf.

the existence of supply and demand for the futures contracts at issue, and thus induce those other market participants to trade against orders that the defendant and his co-conspirators placed and did want to execute on the opposite side of the market from the Spoof Orders at prices, quantities, and times that the other market participants otherwise would not have traded."[10]

33.    Often, in furtherance of a spoofing conspiracy, traders place numerous simultaneous orders on both the buy and sell side of a commodity, one set of which–the "spoof" orders–they intend to cancel and the opposite set they intend to execute at prices artificially changed to their benefit, but to the detriment of other persons transacting contrary to the spoof orders.  When, for example, traders seek to lower the price of a commodity future in order to purchase it at a cheaper price, they place numerous sell orders at consistently lower prices in order to artificially lower the price of that commodity.  The traders then execute their genuine buy orders while simultaneously canceling their spoof sell orders.

34.    Traders engaging in spoofing, like the Defendants, put themselves on both sides of a transaction by placing "genuine orders"–real orders intended to be executed–based on the inflated or deflated price created by an outstanding spoof order.  These "genuine orders" are generally placed in a much lower quantity.

35.    By reason of Defendants' spoofing, Plaintiffs and the Class were induced to buy or sell at prices, quantities and times they would not have otherwise.

36.    Throughout the Class Period, Defendants intended to and did transmit materially false and misleading liquidity and price information and manipulated the precious metals futures markets and options on those futures contracts to deceive other market participants and unjustly enrich themselves, thereby causing losses to Plaintiffs and the Class.

---

[10] MLCI NPA, at 10.

37.     Throughout the Class Period, Defendants directed and/or placed numerous electronic orders to buy and sell precious metals futures contracts with the intent to cancel those orders before execution.  Defendants Bases, Pacilio and John Does 1–18, made at least hundreds of such "spoof orders" in order to profit or avoid losses for themselves and Defendants MLCI and MCS.  This strategy was part of a conspiracy between Defendants Bases, Pacilio, John Does 1–18 and their supervisors and employers.

38.     The wide-ranging scheme to defraud investors operated from computers at MLCI and MCS offices, and other affiliated entities where Bases, Pacilio, and the John Doe Defendants routinely placed spoof orders on the NYMEX and COMEX.  These spoof orders were transmitted via interstate commerce to Plaintiffs and the Class.

39.     During the Class Period, Plaintiffs and the Class entered into futures contracts and options on futures contracts, the prices of which were deliberately manipulated by Defendants. Plaintiffs and the Class were damaged thereby.  At all times, Defendants created a false sense of supply and demand to get Plaintiffs and the Class to trade at manipulated prices which would enrich Defendants who were on the other side of the transaction.

40.     Each spoofing incident allowed Defendants to buy at below market prices or sell at prices higher than the prices would have been but for Defendants' spoofing.  Plaintiffs and the Class could not have discovered Defendants' scheme because of its inherently covert nature, and the Defendants' deliberate attempts to conceal the scheme from counterparties to the trades made by Defendants.  Nor could any reasonable due diligence have enabled Plaintiffs and the Class to uncover the secret inner workings of MLCI, MCS, and their traders.

41.     On February 11, 2011, at approximately 8:04:10.686, a John Doe MLCI trader placed an iceberg[11] primary order to buy silver futures contracts at $29.690.  For the following approximately 30 seconds, however, the primary order went un-filled, until a total of 30 lots were executed between approximately 8:04:41.861 and approximately 8:04:43.151.  At 8:04:43, in a private chat room with only other MLCI traders, including the individual Defendants, Defendant Pacilio said to the John Doe MLCI Trader: "ok. [Y]ou have this silver. [R]ight?"

42.     Approximately 40 seconds later, Defendant Pacilio placed three non-iceberg opposite orders (at the other end of the transaction) to sell a total of 550 silver futures contracts.  Specifically, at approximately 8:05:21.657, Defendant Pacilio placed an opposite order to sell 500 silver futures contracts at $29.975, and at approximately 8:05:21.934, he placed two opposite orders to sell 35 silver futures contracts each at $29.975.  Less than 900 milliseconds after placing the last opposite order, Defendant Pacilio cancelled all three opposite orders simultaneously at approximately 8:05:22.799, without them being filled.  Between approximately 8:05:21.690 and approximately 8:05:22.646, the remaining 20 lots of the MLCI John Doe Trader's primary order were filled while the opposite orders were active.

43.     In furtherance of Defendants' spoofing conspiracy, Pacilio admitted in an electronic "chat" conversation with other traders, starting at 8:05:29, including Bases, that he wanted to "push[]" the market through the trading activity described above and told a co-conspirator that it wasn't necessary to for the co-conspirator to "spoof it" as Pacilio was placing fraudulent orders himself:

**Pacilio**: that was me pushing it

---

[11] An "iceberg" or "iceberg order" is an order to buy or sell that only makes small portions of the entire order visible to the market at one time.

11

**Pacilio**: don't do it yourself. I will help you.

**Pacilio**: don't spoof it

**Pacilio**: what did you get 70 lots there?

**MLCI John Doe Trader**: Ok

**MLCI John Doe Trader**: Yep

44.     In sum and substance, Defendant Pacilio placed spoof orders with the intent, at the time they were entered, to cancel them before execution in order to send materially false and illegitimate signals of supply and demand to the market so that Defendant Pacilio could fill the genuine offers of his colleague at the other end of the transactions.  However, Defendant Pacilio canceled the orders before execution.

45.     As a further example of the wrongdoing alleged herein, Defendant Bases, while working for Defendant MLCI, placed four spoof orders to sell approximately 40 COMEX gold futures contracts on June 10, 2011, for a price of $1,535.40 and five additional spoof orders to sell approximately 50 gold futures contracts at a price of $1,535.30.  Defendant Bases placed these orders with the intent, at the time entered, to cancel the offer before they could be executed, which sent materially false and illegitimate signals of supply and demand to the market, so that Defendant Bases could appear to fill the genuine offers of his colleague at the other side of the transaction.  However, Defendant Bases canceled the orders before execution.

46.     As another example of Defendants' spoofing scheme, on June 10, 2011, Defendant Bases placed four fraudulent orders to sell approximately 40 COMEX gold futures contracts for approximately $1,535.40, totaling about $61,141, and five fraudulent orders to sell approximately 50 COMEX  gold futures contracts for approximately $1,535.30, totaling $7,675,600.  This was done to facilitate Trader 1's Primary Order.  Defendant Bases cancelled

all nine fraudulent orders in less than 2.9 seconds, including cancelling two fraudulent orders in less than one second, without receiving any fills.

47.     On or about February 9, 2012, as another example, Bases placed approximately three fraudulent orders to buy approximately 30 gold futures contracts at an approximate price of $1,747.30, with an approximate total value of $5,241,900, in order to facilitate the execution of a primary order by Trader 1. Bases canceled all three fraudulent orders in less than 1.5 seconds without receiving any fills.

48.     On January 10, 2014, Defendant Bases placed four spoof orders to buy approximately 40 gold futures contracts at $1,245.10.

49.     On that same day, Plaintiff Morris Jeremias purchased and sold gold futures contracts.  Plaintiff Morris Jeremias suffered economic injury, including monetary losses, as a direct result of Defendant Bases' manipulation of gold futures contracts on June 10, 2014.

50.     Further spoof trades, which were placed by Defendant Pacilio, included:

| Approximate Date Order Placed | Approximate Time Order Placed | Contract | Approximate Price Per Ounce | Approximate Number of Contracts in Order (Buy/Sell) | Approximate Total Value of Order |
|---|---|---|---|---|---|
| January 24, 2014 | 9:44:54 AM | Gold | $1,268.00 | 50 Buy (Bid) | $6,340,000 |
| February 18, 2014 | 3:20:32 PM | Gold | $1,322.20 | 100 Buy (Bid) | $13,222,000 |
| February 28, 2014 | 10:31:36 AM | Platinum | $1,453.20 | 200 Buy (Bid) | $14,532,000 |
| April 17, 2014 | 10:57:48 AM | Silver | $19.635 | 100 Sell (Offer) | $9,817,500 |
| October 6, 2014 | 10:26:46 AM | Platinum | $1,244.00 | 100 Buy (Bid) | $6,220,000 |

51.     Furthermore, Plaintiffs Yuri Alishaev and Morris Jeremias suffered economic injury, including monetary losses, as a direct result of Defendants' manipulation of precious metals futures prices.  For example, the DOJ's criminal filings and the CFTC Order provide the additional examples of Defendants' misconduct, including January 24, 2014, when Defendant Pacilio engaged in spoofing to manipulate the prices of COMEX gold futures contracts. Plaintiffs Yuri Alishaev and Morris Jeremias bought and sold COMEX gold futures contracts on this same day and suffered a net loss because they transacted at artificial prices caused by Defendant Pacilio's spoofing.

52.     In addition, on February 18, 2014, Plaintiffs Yuri Alishaev, Morris Jeremias, and Abraham Jeremias bought and sold COMEX gold futures contracts, when Defendant Pacilio, while working for Defendant MSC, placed spoof orders conveying a false sense of supply and demand.

53.     Last but not least, on April 17, 2014, Plaintiff Yuri Alishaev bought and sold COMEX silver futures contracts, the same day Defendant Pacilio, while working for Defendant MSC, manipulated this market to enrich himself, causing harm to Plaintiff Yuri Alishaev.

54.     As a result of Defendants' unlawful spoofing activities, COMEX gold and silver, and NYMEX platinum, and palladium futures contracts, and options on those futures contracts, traded at artificial prices throughout the Class Period.  Plaintiffs were deprived of transacting in a lawful, non-manipulated, competitive market for precious metals futures contracts, including options on those futures contracts, and otherwise suffered injury to their  business and property as a direct and proximate result of Defendants' unlawful conduct.

55.     The wide-ranging and long-running fraud on participants in the precious metals commodities markets orchestrated by Defendants Bases, Pacilio, and John Does 1–18, was

conducted while they were employed by Defendants MLCI, MSC, and their related entities while working within the scope of their employment.

56.     Each Defendant ratified, approved, joined in, acquiesced, or authorized each other's wrongdoing, and benefited from their collective misconduct.  Every Defendant acted in a manner to profit from a fraud on the precious metals commodities exchanges to the detriment of market participants, such as Plaintiffs and the Class.  At all relevant times, Defendants committed the acts alleged herein in a knowing and purposeful manner to achieve the results stated.

## CLASS ACTION ALLEGATIONS

57.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and as a representatives of the following Class:

> All persons and entities that purchased or sold any COMEX gold and/or silver futures contract(s), or NYMEX platinum and palladium futures contract(s), or any option on those futures contracts, during the period of at least January 1, 2008 through December 31, 2014.

58.     Excluded from the Class are Defendants, their officers and directors, management, employees, subsidiaries, or affiliates.

59.     The members of the Class are so numerous that joinder of the individual members of the proposed Class is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that at least hundreds, if not thousands, of geographically dispersed Class members transacted in COMEX and NYMEX precious metals futures contract(s), or options on those futures contracts during the Class Period.

60.     Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the members of the Class sustained damages arising out of Defendants' common course of conduct and violations of law complained of herein.  The injuries and damages of

Plaintiffs and each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws alleged herein.

61.     Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs are adequate representatives of the Class and have no interest that is adverse to the interests of absent Class members.  Plaintiffs have retained counsel competent and experienced in class action litigation, including commodity futures manipulation class action litigation.

62.     Common questions of law and fact exist as to Plaintiffs and all Class members, and these common questions predominate over any questions affecting only individual members of the Class.  These predominant questions of law and/or fact common to the Class include, without limitation:

a.  Whether Defendants manipulated the price of COMEX gold and silver futures, and/or NYMEX platinum and palladium futures contracts, or the price of options on those futures contracts;

b.  Whether such manipulation caused the price of those futures contracts, or the price of options on those futures contracts, to be artificial;

c.  Whether such manipulation caused a cognizable injury under the CEA;

d.  Whether Defendants' unlawful conduct caused actual damages to Plaintiffs and the Class;

e.  Whether Defendants were unjustly enriched at the expense of Plaintiffs and members of the Class.

f.  The operative time period and extent of Defendants' unlawful conduct; and

g.  The appropriate nature and measure of Class-wide relief.

63.     A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Treatment as a class action will permit a "large number" of similarly situated persons to adjudicate their common claims in a

single forum simultaneously, efficiently, and without the duplication of effort and expense that

numerous individual actions would engender.  Class treatment will also permit the adjudication

of claims by many class members who could not afford individually to litigate claims such as

those asserted in this Complaint.  The cost to the court system of adjudication of such

individualized litigation would be substantial.  Furthermore, the prosecution of separate actions

by individual members of the Class would create a risk of inconsistent or varying adjudications,

establishing incompatible standards of conduct for the Defendants.

   64. Plaintiffs are unaware of any difficulties that are likely to be encountered in the

management of this action that would preclude its maintenance as a class action.

**EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT**

   65. The applicable statutes of limitations relating to the claims for relief alleged in

herein were tolled because of Defendants' fraudulent concealment, including both active acts of

concealment and self-concealing conduct.

   66. By its very nature, the unlawful activity alleged herein was clandestine.

Defendants engaged in secret and surreptitious activities to submit and cancel trade orders into

the COMEX and NYMEX markets in order to manipulate the prices of precious metals futures to

artificial levels.

   67. Defendants concealed their manipulative acts by, *inter alia*, placing orders using

the COMEX and NYMEX trading platforms to buy or sell precious metals futures at a certain

price, even though they secretly had no intent of transacting at that level.  At no point did

Defendants disclose that they placed these orders to manipulate the prices of precious metals

futures.  Because of such fraudulent concealment, and the fact that Defendants' manipulation is

inherently covert.  Plaintiffs and the members of the Class could not have discovered the existence of Defendants' manipulation any earlier than the date of the public disclosure thereof.

68.     As a result of the concealment of Defendants' unlawful conduct and the hidden nature of Defendants' manipulative acts, Plaintiffs assert the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiffs.

69.     Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

**COUNT I**
**Violation of the CEA**
**7 U.S.C. §§ 1, *et seq*.**
**(Against All Defendants)**

70.     Plaintiffs re-allege and incorporate the preceding allegations with the same force and effect as if fully stated herein.

71.     Defendants, through their acts alleged herein, from at least January 1, 2008 through December 31, 2014, specifically intended to and did cause unlawful and artificial prices of COMEX gold and silver futures, and NYMEX platinum and palladium futures contracts, and options on those futures contracts, in violation of the CEA, 7 U.S.C. § 1, *et seq.*, through their use of fictions buy and sell orders and other manipulative conduct.

72.     Defendants manipulated the price of a commodity in interstate commerce or for future delivery on or subject to the rules of a registered entity, in violation of the CEA.

73.     During the Class Period, the prices of precious metals futures contracts, and options on those futures contracts, did not result from the legitimate market information and the forces of supply and demand.  Instead, their prices were artificially inflated, or deflated, by the Defendants' spoofing and other manipulative trading activities.

74.     Throughout the Class Period, Defendants entered large orders to buy or sell without the intention of having those orders fulfilled, and specifically intending to cancel those orders prior to execution.  Defendants did this with the intent to inject false information about supply and demand into the market place, and to artificially move prices up or down to suit Defendants' own trades and positions.  As a result of these artificial prices, Plaintiffs and the Class suffered losses on their trades in precious metals futures contracts, and options on those futures contracts.

75.     Through their use of spoofing and other manipulative techniques, Defendants manipulated the prices of COMEX gold and silver, and NYMEX platinum and palladium futures contracts, and options on those futures contracts, throughout the Class Period and thereby caused damage to Plaintiffs and Class members who purchased or sold at these artificially inflated or deflated prices.

76.     At all times and in all circumstances previously alleged herein, Defendants had the ability to cause and did cause artificial prices of  precious metals futures contracts, and options on those futures contracts.  Defendants, either directly and/or through their employees and / or affiliates, were active in the foregoing markets and were aware of the effects of spoofing and other manipulative conduct on those markets.

77.     Defendants' ability to cause artificial prices was enhanced through their use of high-powered computers and high-speed trading platforms, which allowed them to place and cancel large spoof orders while avoiding having those orders filled.

78.     By their intentional misconduct, Defendants each violated Sections 6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9, 13b, 13(a), and 25(a), throughout the Class Period.

79.     As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class suffered damage and injury-in-fact arising from the artificial pricing of precious metals futures contracts, and options on those futures contracts, to which Plaintiffs and the Class would not have been subject to but for the unlawful conduct of the Defendants as alleged herein..  Plaintiffs and the Class are each entitled to actual damages sustained or the violations of the CEA alleged herein.

**COUNT II**
**Violation of the CEA,**
**7 U.S.C. §§ 1, *et seq*., and Regulation 180.1(a)**
**(Against All Defendants)**

80.     Plaintiffs re-allege and incorporate the preceding allegations with the same force and effect as if fully stated herein.

81.     Defendants acted intentionally—and if they are found to not have acted intentionally, they acted recklessly—in employing the manipulative and deceptive devices described herein to procure ill-gotten trading profits at the expense of Plaintiffs and the Class.

82.     By their intentional misconduct, Defendants each violated Section 6(c) and 22(a) of the CEA, 7 U.S.C. §§ 9 and 25(a).

83.     As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class suffered damages and injury-in-fact due to the artificial prices for the precious metals futures contracts, and options on those futures contracts, to which Plaintiffs and the Class would not have been subject to but for the unlawful conduct of the Defendants.

84.     Plaintiffs and members of the Class are entitled to damages for the violations of the CEA alleged herein.

**COUNT III**
**Violation of the CEA**
**7 U.S.C. § 21(a) and Rule 1.2**
**(Against All Defendants)**

85.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint

with the same force and effect as if fully stated herein.

86.     Each Defendant is liable under Section 21(a)(1) of the CEA, 7 U.S.C. § 2(a)(1),

for the manipulative acts of its agents, representatives, and/or other persons acting for the

Defendants in the scope of their employment.

87.     Plaintiffs and members of the Class are each entitled to damages for the violations

alleged herein.

88.     Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2,

17 C.F.R. § 1.2 (2018), provide that "[t]he act, omission, or failure of any official, agent, or other

person acting for any individual, association, partnership, corporation, or trust within the scope

of his employment or office shall be deemed the act, omission, or failure of such individual,

association, partnership, corporation, or trust."

89.     Pursuant to Section 2(a)(1)(B) of the Act and Regulation 1.2, strict liability is

imposed on MLCI, BAC, and MSC for the actions of their agents.

**COUNT IV**
**Unjust Enrichment**
**(Against All Defendants)**

90.     Plaintiffs re-allege and incorporate the preceding allegations with the same force

and effect as if fully stated herein.

91.     Defendants financially benefitted from their unlawful acts, including but not

limited to their submission of numerous spoof orders for precious metals futures contracts, and

options on those futures contracts, in an artificial direction.  Defendants intended to, and did,

artificially alter prices in a direction that benefitted their trades and positions, at the expense of Plaintiffs and the Class.

92.     These unlawful acts caused Plaintiffs and other members of the Class to suffer injury, lose money, and transact at artificial prices.

93.     As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiffs and members of the Class, and the circumstances are such that equity and good conscience require Defendants to make restitution.

94.     Each Defendant should pay restitution for its own unjust enrichment to Plaintiffs and the Class.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.     An Order certifying this lawsuit as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rule of Civil Procedure, designating Plaintiffs as the Class Representatives, and appointing their counsel as Class counsel;

B.     A Judgment awarding Plaintiffs and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

C.     A Judgment awarding Plaintiffs and the Class restitution for any and all sums of Defendants' unjust enrichment;

D.     An Award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

E.     For such other relief as the Court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand

a trial by jury for all issues so triable.

Dated:  July 12, 2019

Respectfully submitted,

**WEISSLAW LLP**

By: *s/ Mark D. Smilow*
Mark D. Smilow
1500 Broadway, Suite 1601
New York, NY  10036
Tel:  (212) 682-3025
Fax:  (212) 682-3010
Email:   msmilow@weisslawllp.com

*Attorneys for Plaintiffs*

23